# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

MUNIR ZANIAL,

    **Plaintiff,**

v.

SPIRIT BOEING EMPLOYEES' ASSOCIATION,

    **Defendant.**

Case No. 2:18-CV-2124-JAR

## MEMORANDUM AND ORDER

Plaintiff Munir Zanial brings this action against Defendant Spirit Boeing Employees' Association ("SBEA") under (1) 42 U.S.C. § 1981, alleging that SBEA reported him as suspicious to his employer and suspended his contractual privileges because of his race and ancestry, and (2) Title II of the Civil Rights Act of 1964,[1] alleging that SBEA denied him access to a public accommodation on the basis of his race, religion, and ancestry. This matter is before the Court on SBEA's Motion for Summary Judgment (Doc. 32). For the reasons stated in this opinion, the Court **denies** summary judgment.

## I. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[2] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[3] "There is no genuine [dispute] of material

---

[1] 42 U.S.C. § 2000a.

[2] Fed. R. Civ. P. 56(a).

[3] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1210 (10th Cir. 2008)).

fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[4] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5] A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[6]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[7] In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[8]

Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[9] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[10] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the

---

[4] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[5] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[6] *Adler*, 144 F.3d at 670 (citing *Anderson*, 477 U.S. at 248).

[7] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[8] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[9] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[10] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

nonmovant."[11] In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[12] To successfully oppose summary judgment, the nonmovant must bring forward "more than a mere scintilla of evidence" in support of his position.[13] A nonmovant "cannot create a genuine issue of material fact with unsupported, conclusory allegations."[14] Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[15]

## II.   Uncontroverted Facts

The following facts are either uncontroverted or viewed in the light most favorable to Plaintiff.

SBEA is a member-owned nonprofit organization that owns a recreational lake property. SBEA had 3,681 members as of August 2017, and an additional 1,674 spouse or dependent members. Most of SBEA's members are Spirit AeroSystems employees or their dependents. Membership dues are $14 per month. Additionally, any member of the public can pay a fee for a day pass to access SBEA's lake.

Plaintiff, Munir Zanial, is an employee at Spirit AeroSystems. He is Malaysian and a Muslim. Plaintiff has been a dues-paying member of SBEA since June 2016. One of the benefits of SBEA membership is that members can utilize the SBEA lake property, where

---

[11] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71); *see Kannady*, 590 F.3d at 1169.

[12] *Adler*, 144 F.3d at 671.

[13] *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993).

[14] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

[15] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

members are permitted to fish, picnic, rent paddle boats, and rent pavilions on site for private parties. Members can host over 100 guests at events at the lake's recreational facilities.

Plaintiff rented a pavilion at the SBEA lake on September 2, 2017 to celebrate the Muslim holiday, Eid al-Adha, and Malaysian Independence Day. He signed a rental agreement to rent the pavilion. He had more than 60 guests in attendance, and several of the women were dressed in hijabs. Plaintiff had a Malaysian flag at his party, which some of his guests took pictures with. During the party, Eric Chytka, an SBEA employee, approached some of Plaintiff's guests. He witnessed them from the bait shop window, and saw them, in his words, "holding an American flag but where the stars on the flag should be, there was what appeared the Arabic writing for ISIS."[16] Chytka wrote an incident report, five days after the party, detailing his interaction with the group. Chytka re-wrote his incident report at the direction of Trish Pulliam, SBEA's executive director, because she claimed it lacked sufficient detail.[17] Chytka's second report does not mention the flag.[18]

Kevin Kirchgessner, a lake ranger, also wrote an incident report about the party, which reads, "group picnic members had to be reminded to stay seated in rental boats and that our docks have a limit to how many people can be on them at one time."[19] Pulliam also directed Kirchgessner to rewrite his report; Chytka drafted the revised report and Kirchgessner signed it.[20] During Kirchgessner's employment with SBEA, he observed individuals standing in boats once or twice per month, but in the entirety of his employment, he wrote up fewer than ten incident

---

[16] Doc. 34-16.
[17] Doc. 34-24.
[18] Doc. 34-24.
[19] Doc. 34-25.
[20] Doc. 34-17 at 50:22–51:2.

4

reports for violations of any kind at the lake.[21]  Plaintiff testified that Kirchgessner instructed him and his guests to stay seated in the boats only once during the party.[22]  Kirchgessner testified that he told the group "at least two, maybe three" times not to stand on the boats.[23]

Based on Chytka's report, Pulliam thought there were "some red flags that we were concerned with."[24]  She looked up Plaintiff's Facebook page and "the things [she] saw there was [sic] another red flag," namely, some posts about the Quran from 2014.[25]  Pulliam conveyed Chytka's incident report and her Facebook findings to Rick Wilson, a SBEA board member and Spirit AeroSystems employee, through a letter dated September 8, 2017.  Wilson forwarded Pulliam's letter to the Spirit AeroSystems Security Team.  The Spirit AeroSystems' Security Team forwarded the matter to the Federal Bureau of Investigation ("FBI"), which opened an investigation.  As part of the investigation, the FBI visited SBEA, spoke to both Chytka and Kirchgessner, and obtained the guest list from Plaintiff's party as well as a printed copy of Plaintiff's Facebook page.  The FBI never interviewed Plaintiff.  He only found out about the investigation when Facebook's law enforcement team notified him that the FBI had subpoenaed access to his Facebook account.  Spirit AeroSystems never interviewed Plaintiff about any conduct related to SBEA.  He was not terminated and he did not receive any poor performance reviews as a result of the investigation.

On September 14, 2017, the SBEA Board met and suspended Plaintiff's rental privileges. After "at least an hour" of discussion, the Board suspended Plaintiff's privileges to rent pavilion

---

[21] Doc. 34-27 at 13:2–5, 15:15–19.

[22] Doc. 34-4 at 25:17–27.

[23] Doc. 37-4 at 24:2–13.

[24] Doc. 34-6 at 32:24–33:1.

[25] *Id*. at 33:1–4.

5

space.²⁶ The Board considered both incident reports in making their decision, as well as Trisha Pulliam's research into Plaintiff's Facebook and the fact that Plaintiff has been reported as suspicious to the security team at Spirit AeroSystems. The internal record of the suspension states:

> September 14, 2017 – Munir Zanial – Pavillion [sic] privileges suspended – violation of code of conduct, refusal to comply with ranger, refusal to cooperate with agents in authority, purposefully trying to deceive persons with authority. Not complying with safety rules, practices, law and regulations. (standing up in paddles [sic] boats, to [sic] many people on a dock).²⁷

Plaintiff was not notified of the board meeting or his potential suspension, nor was he given an opportunity to challenge his suspension. Dallas Burrow, the president of the Board, testified that he was not aware of any other member being suspended for misuse of the paddle boats.

Plaintiff first learned about his SBEA suspension in January 2018, when he called to rent a pavilion space for his son's birthday party that was to take place March 24, 2018. At the bottom of a printed copy of Pulliam's September 8 letter regarding her concern about the flag incident and Plaintiff's Facebook page, there is a handwritten note, which reads "1/10/18 – he called + tried to rent a facility. Was told he could not rent per the Board of Directors then Munir asked to talk to the Board."²⁸ A few days later, Plaintiff spoke to Pulliam on the phone. She told him that his reservation did not go through because "there was some incident that happened, that occurred back in September,"²⁹ and that he would need to be present at one of the Board of Directors meetings to appeal his case. She did not tell Plaintiff what the incident was, only that it

---

²⁶ Doc. 34-1 at 39:14–16.
²⁷ Doc. 34-3 at 2.
²⁸ Doc. 34-5.
²⁹ Doc. 34-4 at 28:9–22.

happened in September,[30] and she did not tell Plaintiff that she would reserve the space for late March.[31]  Prior to January 2018, Plaintiff did not attempt to rent any space at the SBEA lake, and between September and January, Plaintiff fished at the lake without issue.

On February 5, 2018, Plaintiff's counsel sent SBEA a demand letter.  On February 9, 2018, five months after the September 2 event, Pulliam sent Plaintiff the first official notice of his suspension.  The letter informed Plaintiff that his rental privileges had been suspended from September 14, 2017 through March 14, 2018, and stated that the suspension was the result of safety and code of conduct related violations on September 2, 2017.[32]  The letter also stated that "an appeal has been scheduled for Mr. Zanial on March 8th, 2018, however, since the BoD decision to lift the temporary rental suspension on March 14th, the appeal is not needed."[33]  SBEA's internal log of the incident does not mention a six-month limit; multiple other incidents documented in the log specifically include the duration of the sanction.[34]

In March 2018, Pulliam and Plaintiff discussed his reservation on the phone.  Pulliam stated that they were holding the reservation date and inquired whether Plaintiff intended to use the reservation.  Plaintiff informed Pulliam that he did not intend to use the reservation.

## III.  Discussion

### A.  42 U.S.C. § 1981

Section 1981 protects the right of all persons to "make and enforce contracts" which includes "the making, performance, modification, and termination of contracts, and the

---

[30] *Id*. at 28:17–26.

[31] *Id*. at 30:7–12.

[32] Doc. 34-9.

[33] Doc. 34-29 at 2.

[34] *See* Doc. 34-3.

7

enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[35] Plaintiff asserts that SBEA violated 42 U.S.C. §1981 in two ways. First, SBEA reported him to his employer as suspicious, which led to an FBI investigation, because of his race and ancestry. Second, SBEA suspended Plaintiff's rental privileges because of his race and ancestry. SBEA asserts that summary judgment is appropriate because Plaintiff did not suffer an "actual loss," and therefore, his claim fails on both theories.

The Tenth Circuit has held "a § 1981 claim for interference with the right to make and enforce a contract must involve the actual loss of a contract interest, not merely the possible loss of future contract opportunities."[36] Here, the contract at issue is Plaintiff's membership agreement with SBEA.[37] Under his contract, Plaintiff paid $14 per month to access the SBEA lake property, where he could fish, picnic, rent paddle boats, and rent pavilions on site for private parties. Accordingly, the Court considers whether Plaintiff has demonstrated a genuine issue of material fact as to whether he suffered an actual loss to his SBEA membership contract under either of his theories of liability.

### 1. FBI Investigation

Plaintiff asserts that SBEA's report to Spirit AeroSystems constitutes interference with his contract because "when minority patrons have an existing contract and a defendant subjects them to investigations and searches by law enforcement or private security based on racial and ethnic stereotypes, the District of Kansas has held that this additional scrutiny constitutes a loss

---

[35] 42 U.S.C. 1981(b).

[36] *Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1195 (10th Cir. 2002) (quoting *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1104 (10th Cir. 2001)).

[37] Although Plaintiff mentions his employment contract with Spirit AeroSystems throughout his Complaint, his response makes clear that "his contract with Defendant is the contract that has been disturbed." Doc. 34 at 19. Accordingly, the Court considers whether SBEA's actions constitute an actual loss on Plaintiff's membership agreement, not his employment contract with Spirit AeroSystems.

8

of a Section 1981 contract interest."[38] Plaintiff cites two District of Kansas cases in support of this proposition, which the Court considers in turn.

In *Hester v. Wal-mart Stores*,[39] the plaintiff brought claims under § 1981, alleging that Walmart security accused and detained her for shoplifting solely on the basis of race. The district court granted summary judgment on the plaintiff's claims asserted under the "make and enforce contract clause," but allowed the plaintiff's claims under the "full and equal benefit" of the law theory to proceed to trial based on the plaintiff's theory that she was monitored or detained by Walmart security on the basis of race.[40] In the present case, Plaintiff asserts that SBEA's behavior resulted in "a loss of a Section 1981 *contract* interest" and does not assert that SBEA denied him the "full and equal benefit of" the law.[41] Accordingly, *Hester* does not support Plaintiff's claim.

In *Kelly v. Bank Midwest, N.A.*,[42] the plaintiff brought a § 1981 claim under the contract clause after he faced multiple hurdles while attempting to secure a loan from a bank: the defendant drove by the property the plaintiff listed on his loan application, contacted another bank's fraud department to determine whether the checks presented by the plaintiff had been stolen, and called the police.[43] The defendant moved for summary judgment, arguing that the plaintiff could not establish a claim under §1981 because the bank gave him the loan he requested, and thus he did not suffer an actual loss.[44] The court found that "the mere fact that

---

[38] Doc. 34 at 13.

[39] No. 03-2447-JWL, 2005 WL 2035062, at *7 (D. Kan. Aug. 22, 2005).

[40] *Hester*, 2005 WL 2035062, at *6.

[41] Doc. 34 at 17 (emphasis added).

[42] 161 F. Supp. 2d 1248, 1257 (D. Kan. 2001).

[43] *Id*. at 1254.

[44] *Id*. at 1255.

9

plaintiff obtained the loan . . . is insufficient to preclude the plaintiff's § 1981 claim" because there were factual questions as to whether the bank imposed "additional conditions" on the plaintiff because of race.[45]

Here, Plaintiff alleges that SBEA's report to his employer—who referred the report to the FBI—and subsequent involvement in the FBI investigation constitute a loss to his SBEA membership agreement. The Court, however, finds that Plaintiff has not demonstrated *how* the report constitutes a loss of a contract interest. Simply put, there is no connection between the "additional scrutiny" alleged by Plaintiff and his membership agreement. In *Kelly*, the additional conditions were directly related to the contract—the loan agreement—on which the plaintiff based his § 1981 claim. By contrast, SBEA's report did not interfere with or relate to Plaintiff's membership agreement. The Court finds Plaintiff's contention that "the District of Kansas has held that this additional scrutiny constitutes a loss of a Section 1981 contract interest," without more, to be unsupported. The "additional scrutiny" must interfere with the making, performance, modification, or termination of an *actual contract interest*, or the enjoyment of all benefits, privileges, term, and conditions thereof. Plaintiff has put forth no evidence to support his claim that SBEA's report to Spirit AeroSystems interfered with Plaintiff's membership agreement or his enjoyment thereof. To the extent Plaintiff alleges that SBEA's report led to his rental suspension, the Court addresses this distinct theory below.

### 2. Suspension of Rental Privileges

Plaintiff alternatively alleges that he suffered an actual loss under § 1981 when SBEA suspended Plaintiff's rental privileges because of his race and ancestry. The Court first considers

---

[45] *Id*. at 1255–58.

whether Plaintiff has demonstrated a genuine issue of material fact as to whether Plaintiff's privileges were suspended because of his race and ancestry.

Under the terms of Plaintiff's membership agreement, Plaintiff paid $14 per month to access the SBEA lake property, where he could fish, picnic, rent paddle boats, and rent pavilions on site for private parties. Accordingly, renting pavilions was an explicit privilege of Plaintiff's membership agreement. On September 2, 2017, Plaintiff exercised his privilege as a member and rented a pavilion to celebrate the Muslim holiday, Eid al-Adha, and Malaysian Independence Day. Two incident reports stemmed from Plaintiff's party: (1) Chytka's report claiming that guests at the party had a desecrated an American flag with "the Arabic writing for ISIS,"[46] and (2) Kirchgessner's report, which states that Plaintiff's guests had to be reminded to stay seated in the paddle boats and to limit the number of individuals on the docks. Kirchgessner testified that during his employment with SBEA, he observed individuals standing in boats once or twice per month, but in the entirety of his employment, he wrote up fewer than ten incident reports for any kind of violation at the lake.[47] Pulliam, after seeing the reports, conducted her own investigation into Plaintiff and became uneasy when she saw Plaintiff's Facebook posts about the Quran.

On September 14, 2017, the SBEA Board met and suspended Plaintiff's pavilion rental privileges after "at least an hour" of discussion.[48] The Board considered both incident reports in making their decision, as well as Pulliam's research into Plaintiff's Facebook. The internal record of the suspension states:

> September 14, 2017 – Munir Zanial – Pavillion [sic] privileges suspended – violation of code of conduct, refusal to comply with ranger, refusal to cooperate with agents in authority, purposefully trying to deceive persons with authority. Not complying with

---

[46] Doc. 34-16.

[47] Doc. 34-27 at 13:2–5, 15:15–19.

[48] Doc. 34-1 at 39:14–16.

safety rules, practices, law and regulations. (standing up in paddles [sic] boats, to [sic] many people on a dock).

Burrow, the president of the Board, testified that he was not aware of any other member being suspended for misuse of the paddle boats. Based on these facts, the Court finds there is a clear genuine issue of material fact as to whether Plaintiff's suspension was motivated by his race and ancestry. Accordingly, the Court considers whether Plaintiff's suspension constitutes an actual loss.

First, the Court addresses SBEA's argument that Plaintiff must show that he attempted to rent a pavilion during his suspension to sustain a § 1981 claim. Plaintiff asserts that the mere imposition of a suspension of a privilege of his membership agreement on the basis of race is sufficient. The Court agrees. Plaintiff's suspension was not merely "the possible loss of future contract opportunities;"[49] the terms and conditions of Plaintiff's existing contract, for which he continued to pay a monthly fee, were modified, allegedly on the basis of race.

SBEA cites a series of § 1981 cases based on retail transactions where courts have required interference with an actual contract interest—*i.e.* a particular purchase—as opposed to theoretical future purchases to sustain a § 1981 claim. Courts have held that individuals who *do not have an existing contract* may not bring a § 1981 claim unless they can show actual interference with a specific contract, rather than theoretical future losses on potential contracts.[50] The present case is distinguishable. Plaintiff's full enjoyment of his contract, for which he paid a monthly fee, is not a theoretical future loss. His existing membership agreement—not potential

---

[49] *Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1195 (10th Cir. 2002) (quoting *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1104 (10th Cir. 2001)).

[50] *See, e.g.*, *Morris v. Dillard Dep't Stores, Inc*., 277 F.3d 74, 746–47 (5th Cir. 2011) (holding that the plaintiff failed to state a claim under § 1981 when she could not show a "tangible attempt to contract" during the course of the ban); *Bagley v. Ameritech Corp.*, 220 F.3d 518 (7th Cir. 2000) (holding that the because the plaintiff opted to not to contract with the defendant, the defendant was not liable under § 1981).

future pavilion rental agreements—is the relevant contract in the present inquiry. Here, an explicit privilege of Plaintiff's membership agreement was modified and his enjoyment of his membership privileges was limited,[51] allegedly on the basis of Plaintiff's race and ancestry. Accordingly, Plaintiff suffered an actual loss under his membership agreement, and summary judgment is inappropriate as to Plaintiff's § 1981 claim.

Further, even if the suspension alone does not constitute an actual loss under the facts of this case, the Court finds there is a genuine issue of material fact as to the duration of Plaintiff's suspension. Plaintiff first learned about his SBEA suspension in January 2018, when he called to rent a pavilion space for his son's birthday party in March 2018. A handwritten note reads "1/10/18 – he called + tried to rent a facility. Was told he could not rent per the Board of Directors then Munir asked to talk to the Board."[52] A few days later, Plaintiff spoke to Pulliam on the phone, and she told him that his reservation did not go through because "there was some incident that happened, that occurred back in September."[53] Pulliam did not tell Plaintiff what the incident was, only that it happened in September,[54] and she did not tell Plaintiff that she would reserve the space for March 24 as he originally requested.[55]

On February 5, 2018, Plaintiff's counsel sent SBEA a demand letter. There is no record prior to the demand letter that the suspension was for a period of six months. On February 9, 2018, five months after the September 2 event, Pulliam sent Plaintiff the first official notification

---

[51] *See* 42 U.S.C. § 1981(b) ("For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.").

[52] Doc. 34-5.

[53] Doc. 34-4 at 28:9–22.

[54] *Id*. at 28:17–26.

[55] *Id*. at 30:7–12.

of his suspension. The letter informed plaintiff that his rental privileges had been suspended from September 14, 2017 through March 14, 2018, and stated that the suspension was the result of safety and code of conduct related violations on September 2, 2017.[56] SBEA's internal log of the incident does not mention a six-month limit, although multiple other records specifically include the duration of the respective sanction.[57] Further, although Pulliam told Plaintiff on the phone in January that he would need to talk to the board to appeal his suspension, in her February 9 letter to Plaintiff's counsel, she stated "an appeal has been scheduled for Mr. Zanial on March 8th, 2018, however, since the BoD decision to lift the temporary rental suspension on March 14th, the appeal is not needed."[58] Drawing all inferences in Plaintiff's favor, the Court finds that the lack of any record of a six-month limit on his suspension prior to this litigation, coupled with the fact that Pulliam did not tell Plaintiff that she would reserve the pavilion space for March 24 for him on their January phone call, demonstrates a genuine issue of material fact as to the length of Plaintiff's suspension.

Finally, SBEA asserts that Plaintiff fails to state a claim under § 1981 because "Plaintiff could have proceeded with the reservation he requested. He declined."[59] The fact that Plaintiff later decided not to use the reservation, after his membership privileges were suspended and he was allegedly told that he could not rent, is not dispositive.[60] The Court denies summary judgment on Plaintiff's § 1981 claim.

---

[56] Doc. 34-9.

[57] Doc. 34-3.

[58] Doc. 34-29 at 2.

[59] Doc. 33 at 12.

[60] *See, e.g., Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1106 (10th Cir. 2001) (finding that had there been no interference, the plaintiff would have entered the contract); *Kelly v. Bank Midwest, N.A.*, 161 F. Supp. 2d 1248, 1257 (D. Kan. 2001) ("[T]he mere fact that plaintiff obtained the loan from defendant is insufficient to preclude plaintiff's section 1981 claim.").

14

**B.    42 U.S.C. § 2000a**

Section 2000a prohibits discrimination in places of public accommodation: "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."  SBEA's sole argument in support of summary judgment is that Plaintiff's § 2000a claim fails for the same reason it advances with respect to his § 1981 claims—*i.e.* that Plaintiff was "not actually deprived of any privilege, benefit, service, facility, or accommodation" because he never attempted to use his rental privileges during his period of suspension.[61]  Plaintiff responds that his suspension constitutes infringement on his "full and equal enjoyment" of a privilege and further, there is a genuine issue of material fact as to whether Plaintiff was "actually denied" enjoyment of privileges and benefits of a public accommodation.[62]  The Court agrees.

SBEA relies on a series of cases where courts have granted summary judgment on § 2000a claims arising out of the same set of operative facts as insufficient § 1981 claims.[63]  Here, however, the Court has denied summary judgment as to Plaintiff's § 1981 claim.  As discussed above, the Court finds there is a genuine issue of material fact as to (1) whether Plaintiff was suspended, and thereby denied privileges, on the basis of race, religion, or national origin and (2) the duration of Plaintiff's suspension.  By its plain language, § 2000a protects

---

[61] Doc. 33 at 14.

[62] Doc. 34 at 28.

[63] *Jeffrey v. Home Depot U.S.A.*, 90 F.Supp.2d 1066, 1070 (S.D. Cal. 2000); *Harrison v. Denny's Restaurant*, 1997 WL 227963, at *4 (N.D. Cal. Apr. 24, 1997); *Bobbitt by Bobbitt v. Rage, Inc.*, 19 F.Supp.2d 512, 521–22 (W.D.N.C. 1998); *Solomon v. Waffle House, Inc.*, 365 F.Supp.2d 1312, 1331 (N.D. Ga. 2004); *Eddy v. Waffle House, Inc.*, 335 F.Supp.2d 693, 701–02 (D.S.C. 2004).

15

equal enjoyment of privileges at a place of public accommodation. To the extent SBEA, who operates a recreational lake—a place of public accommodation[64]—suspended Plaintiff from a particular privilege, and thereby denied him equal enjoyment of that privilege, on the basis of race, religion, or national origin, there is a genuine issue of material fact as to whether Plaintiff's rights were violated under § 2000a.[65] Accordingly, the Court denies summary judgment on Plaintiff's § 2000a claim.

**IT IS THEREFORE ORDERED BY THE COURT** that SBEA's Motion for Summary Judgment (Doc. 32) is denied.

**IT IS SO ORDERED.**

Dated: April 16, 2019

                                                 s/ Julie A. Robinson
                                                 JULIE A. ROBINSON
                                                 CHIEF UNITED STATES DISTRICT JUDGE

---

[64] Defendant does not contest that SBEA Lake is a place of public accommodation in the current motion.

[65] *See Gibbs-Alfano v. Ossining Boat & Canoe Club, Inc.*, 47 F. Supp. 2d 506, 514 (S.D.N.Y. 1999) (finding that the plaintiffs adequately pled a § 2000a claim when the plaintiffs were suspended from a boat club allegedly on the basis of race).